IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

MARY L. HARMON                                                                                          PLAINTIFF

v.                                                                             CIVIL ACTION NO.1:11CV206-SA-DAS

IBM LENDER BUSINESS PROCESS
SERVICES, INC.                                                                                          DEFENDANT

**MEMORANDUM OPINION**

Presently before the Court is Defendant's Motion for Summary Judgment [49]. Because Plaintiff has duly waived her claims for wrongful foreclosure, conversion, and intentional infliction of emotional distress and she is unable to present sufficient evidence in support of her negligence, gross negligence, and negligent infliction of emotional distress claims, the Court GRANTS that motion.

**FACTUAL BACKGROUND**

On December 28, 2006, Jerry White executed a Promissory Note and Deed of Trust and obtained a loan in the amount of $32,500 from First Horizon Home Loan Corporation for the purpose of purchasing real property located at 726 Calhoun Street in West Point, Mississippi. The deed of trust shows that Jerry White, an unmarried man, was the sole borrower under the agreement. White thereafter married Mary Harmon in November of 2007. In February of 2008, White conveyed the property via warranty deed to an attorney for the sole purpose of re-conveying the property back to White and Harmon as joint tenants with the right of survivorship.

The deed of trust was not renegotiated to include Harmon as a party and the loan obligation remained solely in White's name. Shortly thereafter, White was incarcerated and it became necessary for Harmon to conduct all business relevant to the management of the loan.

Harmon was granted the status of an authorized third party for purposes of discussing and managing the loan, but was not made an actual party thereto.

Following White's release from prison, he was unexpectedly killed and died intestate, leaving his affairs in somewhat of disarray. At the time of his death, Harmon was an authorized party in terms of managing the loan, but was not an actual party to that contract. The estate was not probated and the ownership of the home passed by way of the warranty deed to Harmon. The situation was further convoluted by the fact that shortly after his death, the responsibility of servicing the loan was transferred to IBM Lender Business Process Services, Inc. IBM was informed by Harmon that White, the mortgagor, had died and IBM thus requested that she provide a death certificate evidencing such.

IBM consented to allowing Harmon to take out a new hazard insurance policy on the property and additionally continued to receive and process her payments on the loan. With regard to the payments, however, IBM sent notice to the property address that their acceptance of such was not to be construed as allowing Harmon to assume the loan. IBM continued to inform Harmon that she would need to provide evidence that she was an authorized fiduciary in order to assume the responsibility of the loan. Specifically, based on company-wide policy, IBM requested that Harmon provide a copy of the death certificate, letter of administration, qualification or authority verifying that she was the fiduciary of the estate, and the contact information for the attorney of the estate.

Approximately six months later, the subject property unexpectedly burned, rendering it uninhabitable. Harmon filed a claim against her $65,000 insurance policy. Presumably with the loan payoff in mind, the insurer issued two checks to Harmon and IBM as co-payees. One check was issued for $32,778.73 and the other for $31,117.00. The insurer then issued a stop payment

on the $32,778.73 check and issued a third check made payable to Harmon only. Although the $32,778.73 check would have paid off the loan, the $31,117.00 check was insufficient to do so. It was nonetheless deposited by IBM and placed in a suspense account until further instruction was received.

The deed of trust for the property provided, "[u]nless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the property, if the restoration or repair is economically feasible and Lender's security is not lessened." Harmon contacted IBM to determine whether the initial check had been applied to the loan and informed IBM that she had also enclosed written instruction with the check, directing that it pay off the loan balance. IBM informed Harmon that they had received no instructions with the check, but requested that she subsequently fax those instructions.

The call-log for this transaction is informative. It reflects that IBM staff stated: "the fact that [Harmon] is on the deed but not the loan and [White] is [deceased] is causing multiple issues. I [advised] cust[omer] to [call back] tomorrow about an hour earlier when hazard claims staff are here to make sure we get this resolved for her." As is evident by the present litigation, the parties did not resolve the issue and IBM ultimately informed Harmon that it could not remit the funds or apply them to the loan until she provided adequate documentation that she was authorized to speak for the estate. Although IBM had been provided the deed and recognized Harmon's right as a joint tenant, it viewed her as a non-party to the contractual relationship and requested supplemental information regarding her relationship to the estate. Specifically, Harmon was told that in order to act on the loan she would be required to provide documentation reflecting her status as the executrix, personal representative, administer of the estate, or produce

other fiduciary papers granting authority. Harmon ultimately provided the certificate of death, a copy of the warranty deed, and a borrower change form. These documents, however, were insufficient in the eyes of IBM to establish that Harmon could speak for the estate. The borrower change form, labeled merely a 1092 Form, is central to the dispute as both parties vigorously dispute its significance. The defendant argues that this document shows nothing more than that on an unspecified date someone hand-wrote Mary Harmon's name under a "New Borrower's Name" section. Defendant seizes upon the fact that the document is undated and contains no sign of assent to a contractual relationship from First Horizon. The plaintiff, on the other hand, argues that this form affirmatively shows that Harmon was a party to the loan based on the argument that it unambiguously refers to Harmon as a "New Borrower." Following IBM's refusal to give credence to the submitted documents, the communication between the parties thereafter eroded and resulted in the filing of this suit.

Harmon filed suit in the Circuit Court of Clay County, Mississippi, alleging wrongful foreclosure, conversion, gross negligence, negligent infliction of emotional distress, and intentional infliction of emotion distress. Defendants thereafter removed the case to this Court on the basis of diversity jurisdiction conferred under 28 U.S.C. § 1332. Jurisdiction was alleged and is found to be proper on grounds that the parties are completely diverse and the plaintiff seeks unspecified punitive damages thus meeting the minimum amount in controversy requirement. Defendant now seeks summary judgment as to all of Plaintiff's claims. Plaintiff has conceded that summary judgment is due to be granted as to her wrongful foreclosure, conversion, and intentional infliction of emotional distress claims. The Court now takes up the remaining claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323, 106 S. Ct 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little, 37 F.3d at 1075.

**DISCUSSION**

In her complaint, Harmon failed to raise a claim of ordinary negligence, instead relying only on a claim for gross negligence. Defendant therefore claims that Plaintiff should be barred from raising it now. Consequently, the Court addresses this dispute first. In support of IBM's contention that the negligence claim is barred, they point the Court toward Jefferson v. Christus St. Joseph Hosp. to support the proposition that a party cannot rely on claims raised for the first time in a motion for summary judgment. 374 F. App'x 485, 492 (5th Cir. 2010). Harmon counters by asserting that under Mississippi law "[a]n allegation of gross negligence includes negligence" because they differ only in degree. Hollinshed v. Yazoo & M.V.R. Co., 55 So. 40, 40 (1911). The Court finds the position of the Plaintiff persuasive. Because Mississippi substantive law provides that a claim of gross negligence so too includes a claim for ordinary negligence, Plaintiff has not raised it for the first time in response to the motion for summary judgment, and it is therefore properly pled.

In order to recover under a theory of negligence, gross negligence, or negligent infliction of emotional distress, however, the plaintiff must first establish that she was owed a duty. See Century 21 Deep South Properties, Ltd. v. Corson, 612 So. 2d 359, 368 (Miss. 1992). Whether such duty exists is a question of law and may be found to arise from the presence of a contractual relationship. George B. Gilmore Co. v. Garrett, 582 So. 2d 387, 391 (Miss. 1991) (citing Pinnix v. Toomey, 87 S.E. 2d 893, 897-98 (N.C. 1955)). The plaintiff's first obligation in a suit to recover for negligence is proving that such a duty does indeed exist. In re Evans, 464 B.R. 272, 288 (Bankr. S.D. Miss. 2011) (citing Enterprise Leasing Co. v. Bardin, 8 So. 3d 866, 868 (Miss. 2009)).

In the case at hand, Harmon premises the duty owed to her entirely on a contractual relationship she contends existed with IBM. IBM argues that no such contractual relationship existed. It is a bedrock tenet of contract law that the formulation of any contract requires 1) two or more contracting parties, 2) consideration, 3) an agreement that is sufficiently definite, 4) parties with legal capacity to make a contract, 5) mutual assent, and 6) no legal prohibition precluding contract formation. Rotenberry v. Hooker, 864 So. 2d 266, 270 (Miss. 2002) (citing Lanier v. State, 635 So. 2d 813, 826 (Miss. 1994)). A contract is unenforceable if the material terms are not sufficiently definite. Id. (citing Leach v. Tingle, 586 So. 2d 799, 802 (Miss. 1991). It is undisputed that White entered into a contract with First Horizon and that as First Horizon's successor, IBM was so too bound by that agreement. The dispute, however, arises in regard to whether Harmon was a party to a contract with IBM.

Harmon contends first that the 1092 Form supports the proposition that IBM had somehow post-facto added her as a party to the original borrower relationship consummated between White and IBM. She argues that she "had been recognized" as a borrower and this was consistent with the way the finance companies allowed her to make payments and discussed the status of the loan with her. Secondly, although not labeled as such, Harmon pushes forward an implied contract theory, arguing that IBM's acceptance of Harmon's payments and insurance coverage obtained by Harmon support the finding of a contract implied in fact. The Court addresses each of these theories in turn.

In support of her express contract theory, Plaintiff points almost exclusively to the aforementioned Borrower Change Form. Harmon assigns this document a sort of mythical significance, hinging her case on its persuasiveness. Quite frankly, this document simply falls disappointingly short of its billing. Plaintiff contends that the plain language of the document is

unambiguous and consistent with First Horizon's acquiescence of the transfer of the subject property, indicating that she had become a borrower in privity with the finance company. She argues that the form shows that the identified parties had agreed to the change and that First Horizon stipulated it would change its tax filings accordingly.

An actual examination of the document shows far less, however. The document is undated and is unsigned by an agent of either lender. It provides no indicia that First Horizon ever possessed, much less approved, the form. Harmon's implied assertion that the form represents First Horizon's assent to changing its tax filings is simply insupportable. In reality, the form merely states, "Last payment made by the existing Borrower _____. This is important for IRS reporting purposes. You will receive two separate 1098's at year end." This is fairly clearly an instruction from First Horizon that the party proposing such a change should provide adequate details regarding the time frame of the transition to allow First Horizon to make a change to its records. It does not indicate that the change necessarily will be made and certainly does not reflect that the change had already been made. Because the form is unsigned by any agent of First Horizon and bears no indication of approval, it is simply unreasonable to construe this as evidence that the company consented to adding Harmon as a borrower or had entered into a contractual relationship with her. Indicating quite the opposite is the fact that First Horizon and IBM consistently refer to Harmon as an authorized third party or as "M1's wife" throughout their interactions with her. In sum, this form is too ambiguous to establish a contractual relationship between First Horizon and Harmon. The uncontroverted facts instead clearly indicate the contractual relationship existed only between White and First Horizon.

Harmon next contends that by its actions, IBM entered into a contractual relationship with Harmon and it cannot now disavow that implied agreement. Harmon cites the fact that IBM

8

accepted payments from her, worked out a sort of payment plan to bring the mortgage out of arrears, and allowed her to insure the property as evidence of this contractual relationship. In essence, she seems to assert IBM and Harmon entered into a contract independent of that initially entered into between White and First Horizon.

In Morgan v. Linham, the court addressed a fairly similar situation. 86 So. 2d 473, 473 (Miss. 1956). There, the deed of a trust was executed by T.S. Sutton and his wife. Id. at 474. Thereafter, the wife died and Sutton conveyed the property to his daughter. Id. Upon the daughter's death, the property rights passed to her husband, Linham, as her sole heir. Id. The property, then owned by Linham, was nonetheless encumbered by the lien resulting from the original deed of trust executed by Sutton. Id. The holder of the deed of trust allowed Linham to make payments on the indebtedness for approximately two years despite the fact that he had not expressly assumed the loan. Id. The loan fell into default and the holder foreclosed on the property without first providing notice to Linham, relying on the fact that he was not legally the mortgagor. Id. Although the court upheld the chancellor's finding that equity called for the setting aside of the foreclosure, the court found that Linham had not assumed the loan and could not be considered the mortgagor. Id. at 475. Thus, the mortgagee took on no contractual obligations to Linham by accepting his payments on the property. See id.

The Court finds this principle applicable to the case at hand. Here, Harmon relies heavily on the fact that IBM allowed her to continue to make payments in order to keep IBM from exercising its right to foreclose on the property as evidence to support the creation of a contract. As in Linham, this is simply insufficient to create a contractual relationship between the parties. Additionally, it is uncontested that IBM mailed disclosures to the property address stating that the acceptance of payments was not to be construed as allowing assumption of the

9

loan and finding the creation of a contractual relationship would be even more strained here than in Linham.

By the same logic, Harmon's reliance on the fact that she was allowed to purchase insurance is also misplaced. It is undisputed that the terms of the deed of trust required insurance to be purchased. The fact that Harmon chose to obtain coverage on her own volition rather than waiting for IBM to obtain it and charge the premiums to the outstanding debt does no more to support the creation of a contract than allowing her to make payments on the obligation as they became due. Finally, nor does her assertion that she entered into a payment plan with IBM provide her any relief. In support of this theory, Harmon points to an ambiguous entry in the call log, which alludes to the creation of a payment plan. It specifies no details and Harmon, herself, has been unable to provide such details. This unsupported assertion is insufficient to create a genuine dispute of material fact. Little, 37 F.3d at 1076 (holding that a dispute of material fact is not created by metaphysical doubt, conclusory allegations, or unsubstantiated assertions.). Regardless, however, under the principles articulated in Linham, this Court fails to see how allowing the owner of a property subject to a lien to make additional payments necessary to bring the loan out of arrears, would, without an assumption of the loan, create a separate contractual relationship.

Therefore, as a matter of law, Harmon is unable to show the existence of a contract between herself and IBM, which would give rise to a finding of a legal duty owed to her. Harmon has based her theory of duty solely on a contractual duty. Because Harmon is unable to provide evidence of such a contract, she is unable to show any duty was owed to her and the motion for summary judgment as to her negligence, gross negligence, and negligent infliction of emotional distress claims is due to be granted.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is granted regarding Plaintiff's wrongful foreclosure, conversion, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, and gross negligence claims.

So ORDERED on this, the 2nd day of October, 2012.

**/s/ Sharion Aycock**
**UNITED STATES DISTRICT JUDGE**